We'll now hear Couser v. Somers. She'll correct the pronunciation later. 23-3041. Mr. Owens. Good morning, Your Honor. It's an honor to be here in this beautiful courthouse and beautiful courtroom. My name is David B. Owens. I represent Wendy Couser, the mother of Matt Holmes, an administrator of his estate. I'll try to save about five minutes for rebuttal, and may it please the Court. Based upon the multiple videos alone, a reasonable jury can find that Defendant Somers violated the Fourth Amendment when he shot and killed Matt Holmes on the basis that Holmes did not pose a threat to the officers or others. As a result, this matter should be remanded for trial where factual disputes can be determined. At the time of the shooting, Matt Holmes was unarmed, had just been shot with beanbags, a taser, had been taken down in a headlock in some sort of leg sweep, he had been hit in the head with the butt of a rifle, and, very importantly, he was restrained by three separate officers. One, Haup, was grabbing his torso and using his legs to control him. A second officer was completely on Mr. Holmes' legs. And then third, Somers was there too. Somers was over Matt Holmes and had his knee placed directly on his side in the waist area, and his hand on the left arm. This is critical because, and you can see this in the body camera footage at about 27 to 29 seconds from Officer Greer, and it's really important and something you can see how much control and position Somers has. At that point, Holmes was not a threat to the officers or others. What do we do about the fact, this is the most problematic fact for me, that Haup yelled to watch for his gun twice while struggling with Holmes on the ground? What do we do with that fact and rule in your favor? Absolutely. And so this, and I want to be really clear about the law here, is that officers can make mistakes. Officers do not have to be perfect. However, they cannot make reasonable, excuse me, they cannot make unreasonable mistakes. And part of the reason I was just emphasizing the fact of the positioning of Somers directly over Holmes, holding his arm that was facing up, was because Somers knew that is significant evidence a reasonable jury could find that his mistake was unreasonable. And because if Haup says, hey, watch my gun, he's laying on his side, the gun side is up, and Somers is directly above that with Mr. Holmes' arm in his hand and his knee on his side. If he looks down directly below where he's at, he can see that Holmes doesn't have any opportunity to grab the gun or anything like that. And so a reasonable jury can look at that evidence, and there are multiple angles. We don't have a perfect omniscient view of what occurred and conclude that that was a reasonable mistake. So you're saying because a reasonable jury, you're trying to understand your argument, that based on the videos, you're saying a reasonable jury would be able to conclude that he wasn't actually grabbing for his gun? I'm saying that and a little bit more, Your Honor, is that because it doesn't have to be something like he was actually doing it or not, right? Because under this court's law, officers have leeway, and there's all the stuff that my friend cites on the other side. You don't have to wait for the glint of the gun, something like that. But the question is whether or not his belief that there was a threat in that moment was unreasonable. And so I'm saying a jury could based upon the videos in the case. And they do create a genuine issue of fact as it relates to the core issue. And yes, sir. Yeah, just building on Judge Rossman's question, in one of the videos, just before the shot is fired, we hear a voice say, I got it. And have we identified who the We have not. And I don't think we need to for the purposes of this appeal, because Summers on the plaintiff's version of events did not hear that. And if he did, we can talk about what that would be. But I was like, there's a dispute as to that issue. And Summers didn't say that. Summers himself didn't say it. Actually, Hawk didn't say that either, did he? He didn't. Well, he claims that he didn't. I don't know who said it. That really means only Holmes could have said it. That is one way to interpret the evidence. But I think that the most important thing, the reason why I think that fact is immaterial is because the more material fact is whether or not Summers heard it. Because the force is judged from the perspective of the officer at the time, not with 20-20 hindsight. So if there's evidence that Summers had heard it, then we'd be arguing about how to take that, right? So if an officer says, watch my gun, and then hears, I got it, there's two ways that that could be interpreted. One, which is, that's totally fine. Or bizarrely, Holmes saying, I have his weapon. And that gets into a whole another range of scenarios. But that's why we don't do the 20-20 hindsight analysis, because as the district court found, that there's a dispute of fact as to whether or not Summers heard that. Well, we don't do the 20-20 hindsight, because Graham says that in the crucial moment, the fast-moving scenario, that a reasonable officer has to make a stamp judgment. And I mean, we have resisting arrest here. So I think I hear your argument is that there might have been a threat of resisting arrest, but there's a jury question that the threat had been neutralized. So if we boil down your argument, that in summary, pulled the trigger after the threat had been neutralized. No, no. I think it's slightly different than that, Your Honor, which is that a reasonable jury could find that there was no threat posed in that rolling on the ground, and there's a legit threat that the suspect has the officer's gun. I don't think I'd be standing here today, because I wouldn't have taken the case. Instead, the question is whether there are disputes of fact about whether there was a threat. And of course, I do think, and I wanted to go back to your question, Judge Washington, because I do think it's partially the positioning. And then when you watch the video, and it's funny how the officers involved and how their videos are less helpful than the ones that are further back. So Holst's dash cam and Geyer's body cam. But if you look at them, I don't see Mr. Holmes struggling on the ground. He's not thrashing his legs. He's not moving about. He's not bashing his arms in the air. I'm focusing on this because you mentioned the word struggle. And this is another reason why I think that a reasonable jury could look at the video and see Mr. Holmes on the ground. Now, he's there. He's just been tackled. And you get some or taken down, whatever terminology you want to use, is that he's on the ground. And I don't think there's any affirmative thing that I see him doing. I see a police officer engaged in a takedown. You have another officer on his legs. And then you have Summer further pinning him to the ground. And when I see that, I don't see a struggle at all. Now, Summer says there was a struggle. I believe there was some kind of struggle. That's the type of dispute that the video in this case creates that a jury has to decide, is what was your vantage point? We don't have that. And so what we have is evidence that would allow a jury to conclude that Mr. Holmes was not a threat here. And the rule in this case is really straightforward, that officers cannot shoot and use deadly force unless there's probable cause to believe that they pose a threat to someone or others. And I do think while we have a lot of disagreements with the district court, the court was correct in saying the decisive fact in this case relates to that issue about what happens after Halp says, watch my gun. And given Summer's position, given his control over Mr. Holmes, given the immediate events that had preceded it, I think a jury could conclude that not only was Mr. Holmes not a threat, but it was also unreasonable for Summers to make that mistake. It looked like you're on. I did have a question. How should we be thinking about sort of the line of authority when we consider the totality of circumstances and whether the officers recklessly created the need for deadly force? Is that line of doctrine applicable here or do we not even engage with that because the only defendant in this case is the officer who did the shooting? That's a great question. I think that to be liable, each officer is assessed on their own actions, right? And I think that's the follow-up from what the Supreme Court said and how this doctrine works absolutely now. So I do think that that's not an independent basis for saying that Summers himself was unreasonable because you have to evaluate him as a matter of his own individual liability. However, if Summers perceived other things that were part of the, that is part of the information that he has at the time, right? So that it's still part of the totality, but it's not like an independent basis for holding him liable in the way that it might be if he were the one who sort of recklessly created the situation. I think this may be where the court's question concern goes because when you watch the video, the dog, who's a new dog, is kind of on the loose and it seems like help has a, he's like, do I get the dog? Oh, this guy's right here. Put my gun away. Grab him now. We're in this whole situation that that is, and so if there were the most negligent or reckless officer to put, you know, put them in this situation, it would have been help. He wasn't sued. He was sued. Those claims settled. And so then the question is that happened. Now we're here on the ground and you've got help on his holding him on the side and using his legs is what he testified to do that. I don't know why I'm acting it out, but you've got another officer on his arms and then go to get your video. 27 And he's restrained by three officers at that point. If there's a warning, okay. But was it reasonable to go from that warning to he has the gun and I'm going to kill him, an act that can never be undone, a reasonable jury could disagree. And I'll save the rest of my time. Thank you. Good morning, Your Honors. May it please the court, counsel. Charles Branson for Defendant Christopher Summers. Summary judgment on the basis of qualified immunity was properly granted in this case. The district court properly reviewed all the factors of Graham and Larson and applied those effectively and efficiently in this matter. What we know coming into this case is that Mr. Holmes committed a burglary or is suspect in committing a burglary, led law enforcement officers on a multi-county chase, reaching speeds over 100 miles an hour. Again, another felony crime. It took stop sticks and a police chase and a disabled vehicle for Mr. Holmes to come to a stop in the median on the highway. Officers surrounded Mr. Holmes and his passenger. Mr. Holmes reacted not by giving up or surrendering, but by ignoring the officers, yelling vulgarities at the officers, giving hand gestures to the officers and smoking a cigarette and listening to music. Eventually, Mr. Holmes feigned some compliance with officers and exited the vehicle. He did what? I'm sorry. Feigned some compliance. It seems like he complied directly. What's that? He complied directly. We're not going to question that he got out of the vehicle. He did get out of the vehicle finally. One could question whether or not it was in compliance with their officers' commands or his decision to get out of the vehicle and take the next step. He gets out of the vehicle. He continues to ignore officers' commands to get on the ground. He continues to be defiant. In the face of being attempted to be arrested and subdued with a less lethal weapon being bad, he again takes no reaction to that. Could you precisely identify the moment when he exits after he exits the vehicle? It conclusively shows his non-compliance by the fact that he does not follow the directions of the officers. He does not get on the ground and they could release the dog or do something else. He, again, does not comply. Officers resort to less lethal beanbag. Deputy Summers attempts to use his taser but believes that only one of the bombs hits him and has no reaction. Officer Topp unleashes the canine who then charges at Mr. Holmes. Holmes attempts to kick the canine in the head. The canine peels off out of the scene. At that point, Officer Hopp attempts to go hands-on and make an arrest of Mr. Holmes. Summers, seeing that Officer Hopp engaged with Mr. Holmes, tries to come to Mr. He attempts to restrain Mr. Holmes who is actively fighting with Officer Hopp who's not complying. Those are the only two officers with hands-on at that point? It is a little bit difficult to show from the video but there is certainly Hopps engaged with Mr. Holmes. Summers has come and laid hands on Holmes. There is another officer towards the feet of Mr. Holmes trying to restrain his legs. What do you mean towards the feet? Towards the feet of Mr. Holmes. He's lying down or he's crouched down or what are you saying? The officer? Yeah. I'm sorry. The officer is standing trying to grab onto the legs of Mr. Holmes and continue to restrain or attempt to restrain Mr. Holmes. There is an officer that comes in from around Mr. Holmes' head and tries to use some type of pain compliance to try to get Mr. Holmes under control. Now, the law tells us through Graham and Taylor that we have to kind of look at the reality of the events surrounding this action. Mr. Summers knows that this person is flaying a felony accusation. He's taking great steps to not be restrained or caught. He's continuing resisting and fighting with officers. That doesn't give Deputy Summers any justification to use lethal force on Mr. Holmes, but it does inform him that Mr. Holmes is not going to go quietly. Well, there's certainly a tension, it seems, in the case law between how we would assess the totality of the circumstances versus what we're looking at at the moment that force is used. So I appreciate your points about the totality, but at the moment that the force is used, I mean, I'm struggling with how, you know, even the district court acknowledged that there was something unclear about the video evidence. I mean, under the circumstances that we have, why shouldn't this question about whether the gun was Holmes' left hand was on Hoff's back and so forth, I mean, this all seems to be something a jury should decide. Well, I would especially disagree, and the disagreement is simply this. You have to look at this from a reasonable officer's perspective at the scene. Christopher Summers' testimony is uncontroverted. Nobody's calling him a liar or saying he didn't believe what he believed. That wouldn't matter, though, because his subjective beliefs don't matter, right, at this stage. Right. But if you look at his interview, he gives KBI immediately after. Granted, it's not clear whether or not Deputy Summers heard I got him, but he is very clear in his interview afterwards that he believes that Tony Hopp said he's got my gun, he's going for my gun. He hears something other than watch my gun to the effect that somebody's got his gun or going for his gun. The video evidence does nothing to dispel any of that in this circumstance. There is a presumption under qualified immunity that when engaged that the plaintiff has to show that Holmes' constitutional rights were violated. They have to show some evidence, not just speculation or conjecture. There's nothing about that video other than speculating what may have happened or occurred that's not portrayed in that video. Nothing in that video or not in that video contradicts the fact that Deputy Summers believed that Holmes was going for Hopp's gun and he had to make a split second decision to save Hopp's life. What did Summers hear? Summarize what you think the uncontradicted record shows. Well, again, clearly on the video you can hear I got it. There's only three people there. Summers didn't say. Is that before or after the shot was fired? That was right immediately preceding, right immediately before the shot was fired. Summers didn't say it. Hopp says he did not say it. The next logical person would be Holmes. Summers doesn't... From which, what are we supposed to infer from that? That he's hollering I got it, I got it because he's gotten the officer's gun, so he's hollering that out? Is that what you're supposed to infer? That's what a reasonable person in that situation could definitely... He's not here, right? So we don't know what and the evidence isn't conclusive on that point of who said it because if in fact the officer said it then there would not be a reasonable assessment of threat, right? Correct. And why isn't that a jury question? Because the officer didn't say it. Summers knows Hopp. Knows Hopp's voice. But you're asking us to believe a witness when it's not... Well... And I got it, I got it itself is ambiguous. If it's from an officer, could mean I got it, I've taken care of the gun, or it could mean... I'm not sure what... What would it mean by an officer that would help the defendant in this case? What would it mean if an officer had said it? Yeah, I mean, it's hard to believe that the why would he say that? And wouldn't that be enough for a jury to think that it was said by somebody else besides the victim? If I understand your question, I don't. But in any event, Summers said he didn't hear that. Well, no, Summers never said he didn't hear that. He said he heard something. I got it, I got it. It was clear from the video. Summers tells the KBI investigators that after he heard Hopp say, watch my gun, he's going for my gun, that he heard something that indicated to him that Holmes had the gun. And that's why he took the actions that he took. And the jury couldn't find that that was an unreasonable inference to draw, given what he could see? No, a jury should not find that to be an unreasonable inference. There's no evidence that is an unreasonable inference. You have to... When you look at the video, it's a pretty disturbing video. You look at it and you say, what? He just shot him. I mean, that's a natural reaction, just looking at the video. That's not the whole story, and you can't really draw your conclusions just from looking at it. But in that context, why couldn't a jury say that this was... thought that there was a danger that required lethal force? Well, again, you're having to go back to that 2020 lens on things. A jury can't look at that. A jury needs to be told not to look at it in hindsight. It's a tough thing to do, but couldn't they find? Well, I don't want to... Well, and a jury doesn't hear it in a vacuum either. If you're just looking at that one and maybe a jury could, I suppose, but you're not. The jury has to look at the totality of the circumstances. The jury has to look at the scenario and how everything unfolds. And they may well agree with Summers, but you're saying no reasonable jury... Every reasonable jury has to agree with Summers. That's... Well, we have qualified immunity to prevent these questions from going to a jury. That's a very interesting issue because we don't have a case just like this, but we do have cases saying when there's no threat of force, no threat, then the use of lethal force is clearly established to be wrong. Maybe we're interpreting clearly established too broadly. There are disputes on my court about that, but we do have cases saying that. And in that light, if the jury finds that it was unreasonable for him to think that the victim posed a threat, wouldn't we have to affirm? If you're asking, well... Affirm a jury verdict, I mean. Affirm a jury verdict, yes. Under those circumstances, maybe. The reality of it is, you're moving on to the second prong here of qualified immunity. It was what Summers put on notice that this type of circumstance would be unlawful actions for him. It would be unreasonable for him to react in this fashion. And it's not. If you look at the cases cited by counsel, all those cases involve situations where somebody has been restrained, stopped resisting, or fleeing when the deadly force in their deadly force was used. In this situation, you have somebody that's actively engaged. But you're contending that the video suggests he was not restrained? That the video suggested he was... He was not restrained? He was not restrained. If he was restrained, nobody would be rolling around. Nobody would trying to grab his legs. Nobody would be using pain compliance to try to get him to stop. Summers would not have to be trying to hold on to an arm. He was clearly not restrained. There's no interpretation of that where you could say, this is a restrained man that's not doing anything. It's just not there. And I think that's what the district court judge sees when he looks at this and say, okay, based upon this, it's unreasonable for Chris Summers to do what he did when he hears, watch my gun, I've got it, or something to that effect that Chris Summers, uncontroverted, believes means that Mr. Hopps in danger. You know, I've exceeded my time. Thank you, counsel. Thank you. So talk about clearly established law. You don't have a case just like this. You have somebody will say it's not restrained, but doesn't pose a serious risk of harm. That's what you're saying the facts would establish. Where's your clearly established law with someone not restrained? Absolutely, Your Honor. So I think that this is a case like Zia Trust versus Montoya, where, and I think that the level of generality that the court sort of framed before that is a case, and that was a decision written by Judge Sater from the Northern District of Illinois sitting by designation. But the determination of whether or not... The Seventh Circuit case isn't going to do it. Judge Sater was sitting by... Here. Here. Sorry, I apologize. Yeah. So in King v. Hill, which is unpublished, and it describes the level of clearly establishment of the law in this point and cites Walker against City of Orem. And Walker is a case where there was a prior chase, there was not compliance, and that person was not restrained and the court found that that clearly established this principle. And one thing that is also clear in the court's precedence is that if there are people who are doing more dangerous or more reckless things, then somebody who is in a lesser fortiori argument. So the cases that I would look to as clearly establishing the law here would be Carr, Walker, the City of Orem, Montoya, which I mentioned, Allen, Tenora... Do they stand for the... What proposition are you saying they support? Absolutely, Your Honor. Is the proposition that when the officer does not have probable cause to believe that somebody is a threat, that deadly force is unjustified. And in some of those cases, for example, there was a bigger dispute in a way about whether or not they were a threat because they had weapons or they were not restrained in the way that the court is describing here. And the reason I brought up Montoya was because in that case, as here, the factual dispute at the center of the case is also dispositive of qualified immunity. Because if Somers reasonably believed that Holmes had his gun, again, I wouldn't be standing here before you. However, if his belief is unreasonable, then there's no question that the violation of his rights would involve clearly established law. And I know the Supreme Court preferences and this court's doctrine preferences resolving immunity issues at the outset, but in some cases, they collapse. They believe that they could shoot and kill somebody who didn't pose a threat. And I don't think a reasonable plaintiff's attorney would say, a guy who grabbed a gun from a police officer rolling on the ground was not reasonably a threat. So the inquiry, I think, collapses in. But those are the cases that we've cited there. And again, as it relates to... I wanted to address just two factual issues. Very quickly. It's just for your honor's prior question. If you look at the dash cam from Officer Hulse, you can see at about 2.59 to 3.01, the other officer restraining Mr. Holmes' legs. And of course, our position is that the restraint of Mr. Holmes is the reason that part of why Summers' belief was unreasonable or a reasonable jury could so find. Thank you for your time. Thank you, counsel. Case is submitted. Counselor excused.